Neil T. SHAYNE, Plaintiff-Appellant,

v.

MADISON SQUARE GARDEN CORPO-RATION et al., Defendants-Appellees.

No. 162, Docket 73–1385.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1973.

Decided Jan. 22, 1974.

Norman H. Dachs, Mineola, N. Y. (Shayne, Dachs, Weiss, Kolbrener, Stanisci & Moe Levine; Eric Lane, Mineola, N. Y., on the brief), for plaintiff-appellant.

James G. Greilsheimer, New York City (Simpson Thacher & Bartlett, Roy L. Reardon and Charles E. Koob, New York City, on the brief), for defendants-appellees.

Before WATERMAN and FEINBERG, Circuit Judges, and GURFEIN, District Judge.*

FEINBERG, Circuit Judge:

Plaintiff Neil T. Shayne appeals from an order of the United States District Court for the Eastern District of New York, John F. Dooling, Jr., J., denying plaintiff's motion to accord class action status to his antitrust action against Madison Square Garden Corporation (the Garden) and related defendants.[1] In his complaint, plaintiff claims that various season ticket subscription plans offered by defendants for popular basketball and hockey games violate the Sherman Act, 15 U.S.C. § 1, by compelling would-be purchasers also to buy tickets for less desirable events. The basis for Judge Dooling's refusal of a class action order was the lack of sufficient unity of interest in the potential classes of purchasers on the issues raised by plaintiff. Because we feel that Judge Dooling's order is not now appealable, we dismiss the appeal.

I

Since this litigation is still in the pre-trial stage, the facts will be taken as alleged in the complaint or as they appear without dispute in the record before us. Plaintiff Shayne is a lawyer and senior partner in the law firm that represents him in this litigation. He apparently has had a keener interest in professional sports than most Garden ticket buyers. In November 1971, he began an antitrust action in the Eastern District of New York against the National Hockey League (NHL), its member teams, including the New York Rangers, Inc., a defendant here, and several of their officers. Shayne there alleged that he owned an exclusive option to purchase the New York area franchise from the World Hockey Association (WHA) and that the defendants in that action had conspired to prevent him from operating a WHA franchise by suddenly announcing grant of an NHL franchise in Nassau County. In that suit, which is still pending, Shayne seeks $33,000,000 in damages. We are told, and plaintiff does not deny, that after

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The other defendants are Madison Square Garden Center, Inc., New York Rangers, Inc. and New York Knickerbockers, Inc., all wholly-owned subsidiaries of the Garden.

instituting that action, he became interested in obtaining the NHL franchise for Nassau County. Late in 1971, a conditional franchise was granted to a group that did not include him. Very shortly thereafter, Shayne commenced the action now before us on behalf of himself and all others who have purchased season ticket subscription plans for certain events at the Garden.

The complaint alleges that the Garden's subscription plans are illegal "tying" arrangements because those who purchase tickets for the regular season Knickerbocker[2] and Ranger games are compelled to buy, in addition, tickets for the pre-season games of these teams and, under some plans, tickets for certain special events, such as a horse show, an ice show, a circus, a rodeo and track meets. We may assume that Knick and Ranger fans regard the latter events with somewhat less intense interest than they usually display.

Beginning with the 1967–1968 season, the Garden has offered seats under six subscription plans and on an individual basis. Five of the six subscription plans are under attack here.[3] The most complete is Plan I. Taking the 1972–1973 season as an example, it offered tickets to 98 events, consisting of 39 regular and two pre-season Ranger hockey games, 41 regular and two pre-season Knick basketball games, and 14 special sports and entertainment events. Under Plan II, a subscriber purchased all the Ranger games, regular and pre-season, and the 14 special events. Plan III substituted Knick for Ranger games, but was otherwise the same. Plan IV offered tickets to the regular and pre-season games of the Rangers, and Plan V did the same for the Knick games. Neither Plans IV nor V included tickets for special events. For at least the six seasons 1967–1968 through 1972–1973, Shayne has purchased four seats in the loge section under Plan III for Knick games and special events.

A few months after filing his complaint, Shayne moved under Fed.R.Civ.P. 23(c)(1) for an order determining that the action be maintained as a class action. As already indicated, the application was denied by Judge Dooling, in a thorough opinion. The judge noted that the number of choices available to potential subscribers and the inevitable antagonisms among the members of the purported class precluded a common finding of coercion or an identification of those situated similarly to Shayne. The judge concluded that plaintiff's lawsuit was unmanageable as a class action. This appeal followed.

## II

Both sides recognize that the first issue before us is whether plaintiff can appeal at this time from the judge's order. Plaintiff argues that the appeal should lie because denial of class status would be the "death knell" of this litigation. The "death knell" reference comes from our decision on the first appeal in Eisen v. Carlisle and Jacquelin, 370 F.2d 119 (2 Cir., 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967), a case which has been before us twice since[4] and now awaits argument in the Supreme Court.[5] In *Eisen* I, plaintiff's individual claim for damages amounted to only $70, and we noted:

> We can safely assume that no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen. . . .

---

2. We concede that only in a legal opinion, or in a similarly grave document, would the Knicks be so formally characterized, and we shall do so only once.

3. The sixth offers season subscriptions to the intercollegiate basketball games played in the Garden.

4. 391 F.2d 555 (1968) (*Eisen* II); 479 F.2d 1005 (1973) (*Eisen* III); 479 F.2d 1020 (denying motion for rehearing en banc of *Eisen* III).

5. Certiorari was granted in *Eisen* III on October 15, 1973. 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146.

\* \* \* \* \* \*

Dismissal of the class action in the present case, however, will irreparably harm Eisen and all others similarly situated for, as we have already noted, it will for all practical purposes terminate the litigation. Where the effect of a district court's order, if not reviewed, is the death knell of the action, review should be allowed. . . .

370 F.2d at 120–121.

The "death knell" doctrine thus announced, has not atrophied through lack of use, e. g., Korn v. Franchard Corp., 443 F.2d 1301 (2d Cir. 1971); Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), although it has not escaped criticism. The Third and Seventh Circuits have recently rejected the doctrine as an undue extension of the right to an appeal before final judgment.[6] Hackett v. General Host Corp., 455 F.2d 618 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L. Ed.2d 812 (1972); King v. Kansas City So. Industries, Inc., 479 F.2d 1259 (7th Cir. 1973) (per curiam). Conversely, there have been rumblings of disapproval in our own court because the doctrine grants a right to appeal to some plaintiffs, but not to any defendants. E. g.,

Eisen III, 479 F.2d 1005, 1007 n. 1, cert. granted, 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973), and the concurring opinion of then Chief Judge Friendly in Korn, supra, 443 F.2d at 1307.[7] And there have been suggestions—in our court and elsewhere—that 28 U.S.C. § 1292(b) might be available for appeals from orders deciding class action status.[8] In Korn, the majority noted that:

> It may be . . . that experience will show that the "death-knell" rule is not "truly workable," and that we may have to formulate a different rule that might also deal with attempts by defendants to appeal from class suit designations, . . . We express no view as to these possibilities other than to say that at the present time we are not persuaded that we should reconsider our precedents. . . .

443 F.2d at 1305. We are still of the same mind. Although use of what is primarily a dollar amount test can be criticized as mechanical, see Hackett, supra, 455 F.2d at 629–630 (Rosenn, J., dissenting), and the drawing of ever-finer lines approaches the arbitrary, reconsideration of the doctrine seems particularly ill-advised at a time when the Supreme Court may, in Eisen III, address itself to the problem.[9] Therefore,

---

6. The Fifth Circuit, however, has apparently adopted a somewhat modified version of the "death knell" rule. E. g., Graci v. United States, 472 F.2d 124, 126 (5th Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2752, 37 L. Ed.2d 155 (1973); Miller v. Mackey Int'l, Inc., 452 F.2d 424, 427 n. 3 (5th Cir. 1971). See also Falk v. Dempsey-Tegeler & Co., 472 F.2d 142 (9th Cir. 1972).

7. On the other hand, the Sixth and Seventh Circuits have held that orders granting class status are not appealable. Walsh v. City of Detroit, 412 F.2d 226 (6th Cir. 1969) (per curiam); Thill Securities Corp. v. New York Stock Exchange, 469 F.2d 14 (7th Cir. 1972).

8. See, e. g., Caceres v. International Air Transport Ass'n, 422 F.2d 141, 144 (2d Cir.

1970); Hackett, supra, 455 F.2d at 623–624. Interlocutory appeals under § 1292(b) have been allowed from a number of class action determinations, generally without discussion of the § 1292(b) issue. E. g., Zahn v. International Paper Co., 53 F.R.D. 430, 434 (D.Vt.1971), aff'd, 469 F.2d 1033 (2d Cir. 1972), aff'd, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973); Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969).

9. In granting certiorari, see note 5 supra, the Supreme Court requested the parties "to brief and argue . . . the jurisdiction of the Court of Appeals." 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146. In response, the

although the parties both suggest to us that reconsideration or redefinition of the "death knell" rule may be in order, we decline the invitation at this time.

### III

■■ We turn then to an application of the doctrine to the facts before us. There is some, but not major, disagreement as to the amount of plaintiff's claim. As noted above, for the six seasons 1967–1968 through 1972–1973,[10] Shayne has subscribed to Plan III under which he has been required to purchase tickets to Knick pre-season games and special events in addition to Knick regular season games. In this court, defendants contend that the measure of Shayne's individual claim should be the damages sustained for all six seasons. However, Shayne argues that his claim is not that large[11] and should be computed on the basis of the damages incurred in four seasons, excluding 1967–1968 and 1972–1973. As to the 1967–1968 season, we agree with plaintiff for it appears that recovery is barred by the four-year statute of limitations in private antitrust actions, 15 U.S.C. § 15b; Shayne's complaint was filed in January 1972, and he presumably purchased his Plan III subscription sometime prior to the beginning of the 1967–1968 season. We agree with defendants, however, that damages for the 1972–1973 season should be included in computing plaintiff's individual claim.[12] It is true that the general rule in private antitrust ac-

tions is that damages arising from acts committed after the filing of the complaint may not be recovered except in a separate suit. E. g., Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79, 81 (2d Cir. 1939). However, this rule does not prevent recovery where plaintiff is allowed to supplement his complaint to include subsequent acts and damages, at least to the time of trial. See Cornwell Quality Tools Co. v. C. T. S. Co., 446 F.2d 825, 832–833 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc., 356 F.2d 371, 377 (9th Cir.), cert. denied, 384 U. S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966); cf. Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652, 661–662 (8th Cir. 1968). Here, we think it likely that the district court would allow such an amendment for the 1972–1973 season. In any event, for purposes of realistically assessing Shayne's economic interest in continuing with the lawsuit, we think it appropriate to take such potential damages into account.

■ Thus, we conclude that for "death knell" purposes Shayne's claim embraces the five seasons 1968–1969 through 1972–1973.[13] We encounter little difficulty converting this claim into a dollar amount. It is apparently undisputed that the total cost of Shayne's tickets to pre-season games ($264) and special events ($2,230) for the five sea-

---

parties have briefed not only the "death knell" determination of *Eisen* I but also our use in *Eisen* III of retained jurisdiction and the "collateral order" doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), to permit the defendants to appeal from an order awarding class status. See *Eisen* III, 479 F.2d at 1007 n. 1.

10. The record before us does not disclose whether Shayne has purchased a subscription for 1973–1974.

11. The spectacle of a plaintiff minimizing his damages to obtain jurisdiction in this court

is one of the less attractive peculiarities of the "death knell" rule.

12. Defendants assert in this court, and Shayne does not deny, that he continued as a purchaser of tickets for the 1972–1973 season.

13. Because of our disposition of this case, we need not speculate as to whether Shayne has incurred any damages in the 1973–1974 season. See note 10 supra.

sons was $2,494.[14] Trebling this amount, as required by 15 U.S.C. § 15, we determine that Shayne's individual claim is $7,482. We have previously held that a claim of $8,500 was large enough for us to assume that the individual action would continue although class status was denied. *Milberg v. Western Pacific R. R.,* 443 F.2d 1301, 1306–1307 (2 Cir., 1971).[15] A claim of $7,482 is, of course, close to that amount and far larger than the individual claim in any case in which we have allowed an appeal under the "death knell" doctrine. See *Eisen* I, *supra,* 370 F.2d at 120 ($70 individual claim); *Green, supra,* 406 F.2d at 295 n. 6 (less than $1,000); *Korn, supra,* 443 F.2d at 1306 ($386). See also Gosa v. Securities Investment Co., 449 F.2d 1330, 1332 (5th Cir. 1971) (per curiam) (individual claim of $3,-322.20; no appeal under "death knell" rule). In addition, plaintiff Shayne is an experienced attorney, well represented by his own law firm. Finally, there is little doubt even on this pretrial record that plaintiff's ongoing struggle with the NHL provides a strong motive for continuing the suit apart from the recovery of individual damages. Under these circumstances, it seems clear that dismissing the appeal will not administer the death blow to the suit. Accordingly, the appeal, under our precedents, should be dismissed.

Appeal dismissed.

14. Shayne argues that the total cost of all the tickets should not be the measure of his damages since he might not be entitled to recover at all for some events and for others he might be entitled to recover less than the full price. However, the possibility that plaintiff would recover the full cost should he prevail on the merits appears sufficiently strong to provide him with an incentive to continue the suit.

15. Shayne contends that *Milberg* is not controlling, noting correctly that the decision there rested in part on the simplicity of the issues in the individual suit. 443 F.2d at 1307. In this case, he argues, the issues are far more complex and, consequently, the costs of litigating the individual claim will be much greater. But, as Judge Dooling's opinion indicates, much of the complexity flows from the effort to maintain the suit as a class action. Moreover, while many of the individual suit issues are conceptually difficult, the basic legal research, as the briefs show, has already been done. Finally, if Shayne should succeed on the merits, he would have a statutory right to reasonable attorneys' fees, 15 U.S.C. § 15, unlike the securities law plaintiff in *Milberg;* if the recovery should approach his $7,482 claim, the fees awarded might be substantial. See 86 Harv.L.Rev. 438, 440–43, especially notes 10 & 26 (1972).