**Hilda HERBST, Plaintiff-Appellee,**

v.

**INTERNATIONAL TELEPHONE AND
TELEGRAPH CORPORATION et al.,
Defendants-Appellants.**

**No. 314, Docket 73-2062.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1974.

Decided April 3, 1974.

John H. Schafer, III, Washington, D. C. (Charles E. Lister, Covington & Bur-ling, Washington, D. C., Joseph P. Cooney, Cooney, Scully & Dowling, Hartford, Conn., on the brief), for defendants-appellants International Telephone and Telegraph Corp., Raymond L. Brittenham, Francis J. Dunleavy, Russell F. Erickson, Harold S. Geneen, R. Newton Laughlin, Hart Perry and Ted B. Westfall.

Samuel E. Gates, Robert L. King, Debevoise, Plimpton, Lyons & Gates, New York City, John Q. Tilson, Wiggin & Dana, New Haven, Conn., on the brief, for defendants-appellants Eugene R. Black, George R. Brown, Alvin E. Friedman, J. Patrick Lannan, John A. McCone and Warren Lee Pierson.

James A. Wade, Robinson, Robinson & Cole, Hartford, Conn., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief, for defendant-appellant Felix G. Rohatyn.

Sidney B. Silverman, New York City, (Silverman & Harnes, New York City, James O'Connor Shea, New Haven, Conn., on the brief), for plaintiff-appellee.

Before DANAHER,* LUMBARD and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

This appeal from the District of Connecticut by the International Telephone and Telegraph Corporation (ITT) and its directors in May 1970 [1] brings before us once again important questions concerning the administration of class actions. The first and more difficult issue is whether Chief Judge Blumenfeld's order of May 11, 1973, which held that this case may be maintained as a class action is appealable at this time. The second issue is whether the judge was correct in so holding. We hold that the order is appealable and that the district court correctly decided that a class action is proper.

---

* Senior Circuit Judge of the District of Columbia Circuit, sitting by designation.

1. One director, Charles T. Ireland, Jr., died at about the time this action was commenced, and plaintiff has chosen not to serve his estate.

## I.

Alleging that ITT in its controversial[2] acquisition of the Hartford Fire Insurance Company (Hartford) violated several provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 as well as Rules 10b–5 and 15c–2 of the Securities and Exchange Commission, Hilda Herbst initiated this action in September 1972. The complaint, which sought damages or rescission, alleged that Herbst had owned 100 shares[3] of Hartford common stock which she exchanged for 100 shares of ITT cumulative preferred stock, $2.25 convertible series N (with voting rights). In connection with this exchange, Herbst was given a prospectus dated May 26, 1970. Herbst admitted in a subsequent affidavit that on August 4, 1970, she sold the ITT preferred stock which she received in the exchange.

The prospectus stated that it was the opinion of counsel for ITT and Hartford that if ITT in its exchange offer acquired at least 80% of the outstanding Hartford common stock and if ITT acquired no Hartford common stock except in exchange for ITT voting stock, then no gain or loss to the Hartford shareholders would be recognized on their exchange for ITT preferred stock and their basis in the ITT stock would be their previous basis in the Hartford stock. ITT represented that it did not hold any Hartford common stock and that it would not acquire any Hartford common stock for cash or property other than ITT voting stock if that would affect the tax-free nature of the exchange. Herbst claims that these representations concerning the tax status of the exchange were false and misleading and that in fact ITT did own Hartford common stock which it had acquired by cash or property other than by its voting stock.

In April 1969 ITT entered into a merger agreement with Hartford. Several months prior to this agreement, ITT had purchased approximately 1.7 million shares or about 8% of the Hartford common stock. In connection with the proposed merger ITT sought from the Internal Revenue Service (IRS) a ruling that the merger would be a tax-free reorganization. The IRS held that the merger would be a valid reorganization, if prior to the merger's consummation, ITT unconditionally disposed of the shares of Hartford common stock it had acquired.[4] On October 21, 1969, ITT received a supplemental IRS ruling, which stated that a proposed contract of sale between ITT and an Italian bank, Mediobanca BancadiCredito Finanziaro-S. p.A. (Mediobanca), would result in ITT's unconditional disposition of its Hartford shares.

2. The Department of Justice tried unsuccessfully to gain a preliminary injunction against the Hartford Insurance-ITT merger. United States v. International Tel. & Tel. Corp., 306 F.Supp. 766 (D.Conn.1969) (Timbers, J.). This case together with the suits against ITT's mergers with the Canteen Corporation and the Grinnel Corporation were eventually settled by consent decree. See United States v. International Tel. & Tel. Corp., 349 F.Supp. 22 (D.Conn.1972), aff'd mem. sub nom., Nader v. United States, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973).

   The complaint in this case appears to be based on a complaint filed on June 18, 1972 in the Southern District of New York by the Securities and Exchange Commission, which charged that ITT in the course of the Hartford merger sold unregistered securities by its arrangement (discussed below) with an Italian bank. Two days later ITT agreed to a permanent injunction. BNA Securities Regulation & Law Reporter, June 21, 1972, at A–6.

   Subsequent to the argument in this case, the Internal Revenue Service revoked the revenue ruling that it gave in connection with the merger of ITT and the Hartford Fire Insurance Company. ITT says that it will seek judicial review of the revocation. N.Y.Times, March 7, 1974, at 1, col. 1.

3. The complaint stated that Herbst owned 200 shares. A later affidavit by Herbst stated that she only owned 100 shares.

4. Apparently, the Hartford stock, which evidently had been acquired for cash, had to be sold so that the Hartford stock ITT owned after the merger would have been exchanged "solely" for ITT voting stock. Internal Revenue Code of 1954, § 368(a)(1)(B).

The contract between ITT and Mediobanca was signed on November 3, 1969. At the same time Mediobanca and ITT's investment bankers, Lazard Freres & Co. (Lazard), signed an agreement, which Herbst alleges the IRS never saw before it made its ruling. Herbst claims that by reading the two contracts together it becomes apparent that ITT did not sell its Hartford stock to Mediobanca but that in fact Mediobanca was holding ITT's stock for a fee, and that, while Mediobanca held the stock, ITT retained the risks and benefits of ownership including the right to dividends and profits or losses upon sale.

The ITT-Hartford merger never became effective, for in December 1969, the Insurance Commissioner of Connecticut disapproved the plan. ITT then made arrangements to offer Hartford shareholders a voluntary exchange of their stock for ITT preferred stock. This exchange was conditional upon at least 95% of the Hartford shares being exchanged unless ITT chose to declare the exchange effective after 80% was exchanged. Apparently because the tax consequences of this plan were identical to those of the aborted merger, no effort was made to obtain a further IRS ruling. On May 23, 1970, following hearings, the Insurance Commissioner held that the proposed offer was fair to Hartford shareholders and on May 26 the offer became effective. Subsequently, more than 99% of Hartford common stock shares were exchanged for ITT preferred.

Soon after this case was started, Herbst moved for an order pursuant to Fed.R.Civ.P. 23(c)(1) holding that she could maintain her action as a representative of all Hartford shareholders who exchanged their stock for ITT preferred. Chief Judge Blumenfeld held that the suit could be maintained as a class action,[5] and from this order ITT appeals.

## II.

In the last few years, we have passed upon the appealability of district court orders which held that a class action could not be maintained but that the individual claim of the plaintiff could proceed to trial. We have developed the "death knell" doctrine, which makes such an order "final" for purposes of appeal under 28 U.S.C. § 1291 if the individual claim is so small that plaintiff will not proceed upon it alone. We first announced this doctrine in Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S. Ct. 1487, 18 L.Ed.2d 598 (1967) (Eisen I), where the district court dismissed the class action but allowed an individual claim of $70 to be continued. We said, "We can safely assume that no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen. . . . If the appeal is dismissed, not only will Eisen's claims never be adjudicated, but no appellate court will be given the chance to decide if this class action was proper under the newly amended Rule 23." 370 F.2d at 120.

We followed this doctrine in Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), where the individual claim was less than one thousand dollars. 406 F.2d at 295 n. 6. But in two cases where the individual claims were very substantial, we held that the dismissal of the class action was not appealable. City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295 (2 Cir. 1969); Caceres v. International Air Transport Association, 422 F.2d 141 (2d Cir. 1970). In Korn v. Franchard Corp. (Korn I), and Milberg v. Western Pacific R. R., 443 F.2d 1301 (2d Cir. 1971), we clarified our holdings by ruling in Korn that the dismissal of the class action was appealable when the

---

5. The court also ordered the parties to notify the members of the class. The plaintiff will initially bear the cost of this notice.

Evidently, no notice has been sent because of this appeal.

individual claim was for $386 and in *Milberg* that the dismissal was not appealable when the individual claim was for $8500. Although the death knell doctrine has been criticized by courts that feel that no order dismissing only the class action claim should be appealable [6] and by commentators who feel all such orders should be appealable,[7] we have reiterated our adherence to the doctrine. Consequently, we dismissed an appeal because the individual claim of $7,482 was so substantial that the plaintiff would sue on that claim alone. Shayne v. Madison Square Garden Corp., 491 F.2d 397 (2d Cir. 1974).

■ Here the defendant is appealing from an order holding that a class action can be maintained. Our most recent statement on whether such an order is appealable is found in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir.), cert. granted, 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973) (*Eisen III*).

Building on Judge Friendly's concurring opinion in *Korn I, supra,* 443 F.2d at 1307, in which he suggested that the court might wish to consider a rule that would "afford equality of treatment as between plaintiffs and defendants," we said that the district court's order allowing a class action to be maintained is appealable. 479 F.2d at 1007 n. 1.

In so saying we relied on Supreme Court cases that have given 28 U.S.C. § 1291 a "practical rather than a technical construction." Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949). See also Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964); Mercantile National Bank v. Langdeau, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963). We stated that an order authorizing a class action is appealable under *Cohen* because

> [it] clearly involves issues "fundamental to the further conduct of the case;" . . .
>
> [and] is also separable from the merits of the case; and [the] irreparable harm to a defendant in terms of time and money spent in defending a huge class action when an appellate court may years later decide such an action does not conform to the requirements of Rule 23, is evident. .

Although other courts of appeals have held that orders authorizing class actions are not appealable,[8] we believe that *Eisen III* reached the correct result and we adhere to it. This circuit has probably been plagued by more class actions than any other circuit. As of June 30, 1973, there were 679 class actions pending in this circuit. Only the Fifth Circuit had more and most of its class actions were civil rights suits which usually seek injunctive relief and are easier to manage. Administrative Office of the United States Courts, 1973 Annual Report of the Director, table 36, at II-44 to -45. The Southern District of New York alone had 523 class actions pending or almost 14% of those pending in all districts. *Id.* at II-42. We believe that immediate review of orders authorizing class actions will aid the district courts in disposing of these cases and promote the sound administration of justice.

First, as noted in *Eisen III* defendants in litigating class actions are likely to expend much money and time in defending such actions because of the enormous damages sought by the representatives of the class. Also the representation features of class actions mean that both parties have to expend much effort and money in notifying members

---

6. King v. Kansas City Southern Industries, Inc., 479 F.2d 1259 (7th Cir. 1973); Hackett v. General Host Corp., 455 F.2d 618 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972).

7. Note, Interlocutory Appeal from Orders Striking Class Action Allegations, 70 Colum.L.Rev. 1292 (1970); Note, Appealability

of a Class Action Dismissal: The "Death Knell" doctrine, 39 U.Chi.L.Rev. 403 (1972).

8. Thill Securities Corp. v. New York Stock Exchange, 469 F.2d 14 (7th Cir. 1972); Walsh v. City of Detroit, 412 F.2d 226 (6th Cir. 1969).

of the class, determining who is in and who has opted out, calculating damages, and the like. Furthermore, the district courts, if cases go beyond initial proceedings, themselves must exercise more effort in supervising such actions than they would in individual cases. See West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U. S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Rule 23(e) requires them to approve any settlements and Rule 23(d) gives them the power and the responsibility of making orders determining the course of proceedings and protecting the members of the class. These gargantuan actions naturally take up infinitely more of the court's time than most other civil actions.

We believe that in the exercise of our supervisory powers over the administration of justice in the district courts it is desirable for us to review orders authorizing class actions before the parties and the district courts expend large amounts of time and money in managing them. Candor compels us to add that as appellate judges we would be reluctant to hold that a class action had been improper after the district court and the parties had expended much time and resources although we might have had serious doubts if we had reviewed the question at the inception of the action. Judicial efficiency requires that appellate review be made before the parties and district courts have spent considerable time, effort, and money, on such actions. Reviewing orders allowing class actions to proceed would determine issues "fundamental to the further conduct of the case," United States v. General Motors Corp., 323 U.S. 373, 377, 65 S.Ct. 357, 89 L.Ed. 311 (1945), and

would constitute a most effective way of exercising our supervisory powers.[9]

■ Second, defendants in class actions often face potential damages in the millions of dollars. If damages in this case came to $5 a share, the judgment would be for approximately $110 million. As noted in *Eisen III* and as Judge Friendly noted in his Carpentier Lectures, the result is that such class actions are usually settled, often with settlements which run into the millions of dollars and are small only when compared to the potential liability. *Eisen III, supra*, 479 F.2d at 1019; H. Friendly, Federal Jurisdiction: A General View 119–20 (1973). Often these cases are settled even though the validity of plaintiff's claims are doubtful. See West Virginia v. Chas. Pfizer & Co., *supra*, 314 F.Supp. at 741–743; American College of Trial Lawyers, Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure 15–17 (1972). Settlements, of course, lessen the district court's problems in administering class actions, but also mean that no appellate court will ever review the question of whether a class action was proper unless immediate review is allowed. We, therefore, conclude that we have jurisdiction to hear this appeal.[10]

### III.

We now turn to the question of whether the district court properly authorized a class action here. For the sake of argument, we shall treat plaintiff's case as being grounded on § 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), and Rule 10b–5, 17 C.F.R. § 240. 10b–5.[11] We do so only

9. We think that there ought to be a right to appeal rather than reliance on the discretion of the district court to grant the certificate under 28 U.S.C. § 1292(b).

10. We do not decide whether defendants in general must appeal at this stage of the proceedings or whether they can wait until after judgment is entered to appeal the class

action determination. See H. Hart & H. Wechsler, The Federal Courts and the Federal System 1154 (P. Bator, D. Shapiro, P. Mishkin & H. Wechsler 2d ed. 1973).

11. The guiding principles of § 14(e) and Rule 10b–5 are the same. The difference is that § 14(e) applies only to tender offers. Chris-Craft Indus., Inc. v. Piper Aircraft

for the purpose of determining whether the district court properly authorized the maintenance of a class action and without prejudice to any other claims that plaintiff may plead.

Because some of ITT's arguments are based on what we perceive to be misunderstandings or misstatements of plaintiff's claim, it would be helpful at the outset to state our understanding of plaintiff's theory of the case. Herbst claims that ITT should have informed the holders of Hartford stock that there was a risk that the exchange might be a taxable event because of the fraud allegedly perpetrated by ITT in getting the favorable ruling from the IRS. (So far as we know, no shareholder has actually been taxed on the exchange.) Herbst claims that if the Hartford shareholders had known all the facts, a significant number of them would not have exchanged their shares, at least at the established rate of one Hartford common share for one ITT preferred, series N. ITT would then have been compelled to give more in exchange than one share of ITT $2.25 preferred if it wished to complete its acquisition. Since ITT was offering an equal amount for each share of Hartford common, regardless of the individual shareholder's tax status, all shareholders would have benefited equally if ITT had been forced to offer more for the Hartford shares. In short, even the shareholder who did not care about the tax status of the exchange would have received more for his Hartford stock if enough shareholders did care and compelled ITT to raise its offer.

■■■ Disposing of ITT's first contentions, the class here is precise enough for class action purposes and Herbst's claims are typical of the class. The complaint defined the class as all holders of Hartford common stock who ex-changed their shares for ITT preferred, which clearly identifies class members. ITT claims that Herbst's claims are not typical, because she sold her ITT preferred in the same year that she received it. Therefore, the argument runs, she cannot represent those who cared about whether the exchange was tax-free. ITT also contends that Herbst cannot represent the large, tax-exempt, institutional shareholders. As noted above, all those who exchanged their shares would have benefited from a higher price. Under Herbst's claims all shareholders, large and small, tax-exempt or not, would benefit equally and so her claim is typical. Furthermore, we do not perceive any conflict of interest between those who have retained their ITT shares and those who have since sold them. The personal interest of those who still hold ITT stock in gaining more from the exchange than they did far outweighs their concern that any award could damage ITT. Herbst v. Able, 47 F.R.D. 11, 15 (S.D. N.Y.1969). Finally, we reject ITT's argument that the claim is not typical because no other class members have intervened on her side. See Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972) (Korn II).[12]

■■■ Citing our decision in List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), ITT next argues that common issues of fact and law do not predominate over questions affecting only individual members for purposes of Rule 23(b)(3) because reliance by each shareholder is a necessary prerequisite to his recovery. We do not agree. The district court noted that this issue was "problematic," but said that requiring proof of individual reliance was no bar to a class action since

Corp., 480 F.2d 341, 362 (2d Cir. 1973), cert. denied, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973).

12. Since there were some 18,000 shareholders in Hartford, clearly there are too many to be joined in individual actions. There is

a claim that Herbst cannot be expected to protect the class adequately, but this is based on claims of inconsistent interests of which we have already disposed. No other claim is made that Herbst and her counsel will not fairly and adequately protect the class.

the common issues could be tried as a class action and individual damages and reliance could be tried separately if necessary. ITT asks us to reconsider, Green v. Wolf Corp., *supra*, 406 F.2d at 301, upon which the district court relied, but reconsideration is unnecessary since subsequent decisions of the Supreme Court and of this court have decisively disposed of ITT's argument that individual reliance is a prerequisite to recovery. In particular, we believe that our decision in Chris-Craft Industries, Inc. v. Piper Aircraft, Inc. Corp., 480 F.2d 431 (2d Cir. 1973), cert. denied 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973), governs here.

In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), minority shareholders brought a class action under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), alleging that a proxy statement sent by the management of a company which urged shareholders to vote in favor of a merger contained a material omission. A significant number of minority shareholders had to approve the merger for it to gain the necessary votes of two thirds of the outstanding shares. Mr. Justice Harlan, speaking for the Court, said that the plaintiffs need not show that the merger would have not been approved if shareholders had known the fact omitted, but only that the omission was material:

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation itself, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an in-

formed choice when they are consulted on corporate transactions.

396 U.S. at 385, 90 S.Ct. at 622.

In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Court applied this rule in a 10b–5 case which involved the failure to disclose information that shares which the class had sold were selling for a higher price elsewhere. Mr. Justice Blackmun said:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

406 U.S. at 153–154, 92 S.Ct. at 1472.

We followed the *Mills-Ute* test in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra*, a case involving a contest for control of Piper Aircraft between Chris-Craft and Bangor Punta Corporation. Chris-Craft claimed, and we found, that letters sent by the Piper family which managed Piper Aircraft to shareholders contained material misstatements and omissions and that a prospectus sent by Bangor Punta to Piper shareholders in connection with its exchange offer was misleading. The prospectus listed the book value of Bangor Punta's interest in a railroad at 18.4 million dollars but did not say that Bangor Punta had attempted to sell its interest and had received a serious bid of 5 million. We held that Bangor Punta was under an obligation to disclose this to Piper shareholders, 480 F.2d at 367–369, and since the misstatements and omissions were material we presumed that without them the Piper shareholders would not have exchanged their shares in such numbers that Bangor Punta gained majority control of Piper Aircraft.

*Chris-Craft* clearly governs the result here. Like *Chris-Craft* the misstate-

ments here occurred in the context of an exchange offer and the misstatements in each case are similar. In *Chris-Craft*, Bangor Punta's statement of the book value of the railroad interest was true as far as it went but it neglected to add that there was evidence that the interest was greatly overvalued on the books and that there was a likelihood that it might be sold at a substantial loss. Here, ITT's statement of the tax consequences of the exchange and its representation that it held no Hartford common stock were true as far as they went, but they allegedly did not add that ITT, while departing with nominal ownership of its Hartford stock, had retained the equitable ownership and that there was a possibility that the IRS might consider the exchange to be a taxable event.

It makes no difference that here the plaintiff was a shareholder in the acquired company while in *Chris-Craft* the plaintiff was the corporation defeated in the contest for control. We did say in *Chris-Craft* that "[t]he fact that [Chris-Craft] was not directly deceived is what makes application of the *Mills-Ute* test appropriate and essential." 480 F.2d at 375. But we followed that sentence with

[i]t would be unduly burdensome to require an offeror to prove actual reliance when, as here, there are numerous shareholders who undoubtedly possess a wide range of expertise and knowledge. It would be impractical to require [Chris-Craft] to prove that each individual Piper shareholder who failed to trade for [Chris-Craft's] stock, or who traded for [Bangor Punta's] stock, relied upon defendants' misrepresentations in doing so.

480 F.2d at 375.

Here as in *Chris-Craft* and *Mills* the reliance of the individual shareholder is irrelevant. Here as in those cases plaintiff was damaged only if significant numbers of shareholders might have acted differently if they had known the truth. An individual shareholder here if he had known of the tax risk would have been forced to choose between accepting ITT's offer, which appears to have been very favorable,[13] and turning it down and becoming a minority shareholder in a company controlled by ITT. But if significant numbers of Hartford shareholders would have been reluctant to exchange at the given rate if they had known the truth, then ITT might have been forced to increase its offer to all Hartford shareholders, and all Hartford shareholders would have been damaged by its failure to disclose.

■ As noted in *Mills* and *Chris-Craft*, it is extremely difficult to prove how shareholders in the aggregate would have reacted if they had known the whole truth. Therefore, it is appropriate for the district court to presume, as we did in *Chris-Craft*, that if there was a material misstatement, then Hartford shareholders would not have exchanged their shares at the rate offered if they had known the truth.[14] Since individual reliance is not a part of plaintiff's case, the district court did not err in holding that common issues of law and fact were predominant.

In conclusion, we believe that Chief Judge Blumenfeld did not abuse his discretion in authorizing the maintenance of a class action. Accordingly, we affirm the district court's order and remand for further proceedings.

13. A share of ITT convertible preferred stock, series N, was to pay $2.25 a year in dividends. A share of Hartford common paid $1.40, $1.10, and $0.92 per share in 1969, 1968, and 1967, respectively.

14. Judge Mansfield in his separate opinion in *Chris-Craft* objected to the majority's statement that there would be "presumption of reasonable reliance" if the misstatement was material. He argued that neither *Mills* or *Ute* used this phrase and said that it raised the issue of whether defendants could rebut the presumption. He felt that the materiality of the misrepresentation established reliance as a matter of law. 480 F.2d at 399–400. Neither the majority in *Chris-Craft* nor the Supreme Court in *Mills* or *Ute* remanded those cases for the purpose of allowing defendants to raise such a defense.

DANAHER, Senior Circuit Judge, concurring (but *dubitante*):

Chief Judge Blumenfeld on May 11, 1973, issued his ruling that the instant case be maintained as a class action. The ITT defendants on June 11, 1973, filed a notice of appeal as to which Herbst filed her motion to dismiss, now pending before us. Prescinding for a moment the question of appealability of an interlocutory order granting class action status, I have no problem with Part III of Judge Lumbard's opinion. That the record presents a class action situation would seem beyond question. Judge Lumbard's opinion on this point has been joined by Judge Mulligan, and I happily concur.[1]

Whether we have jurisdiction to review the interlocutory order presents a wholly different problem. I note that Judge Mulligan says "Although I have grave doubt that this order *granting* class action status is appealable, I am not inclined to depart from *Eisen III* which is now on review in the Supreme Court." (Italics mine).

What amounts to "grave doubt" in Judge Mulligan's view is for me a persistent perturbation. I had supposed that 28 U.S.C. § 1291 would limit our review jurisdiction to "final" decisions of the district court. Had a visiting judge from the Seventh Circuit participated in this case, he would have had in mind Thill Securities Corp. v. New York Stock Exchange, 469 F.2d 14, 15–16 (7 Cir. 1972). Had that visiting judge come from the Fifth Circuit, he would have looked at the impact of § 1291 respecting a class action ruling as interlocutory, even after consideration of the Second Circuit cases cited in Songy v. Coastal Chemical Corporation, 469 F.2d 709, 710 (5 Cir. 1972). A Ninth Circuit visiting judge would not have been oblivious respecting the Second Circuit position in light of the cases cited in footnote 3, Falk v. Dempsey-Tegeler & Co., Inc., 472 F.2d 142, and text at 144. Yet other cases are pertinent, such as Walsh v. City of Detroit, 412 F.2d 226 (6 Cir. 1969) and Hackett v. General Host Corp., 455 F.2d 618 (3 Cir. 1972), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972). The Seventh Circuit, only a few months ago in King v. Kansas City Southern Industries, Inc., 479 F.2d 1259 at 1260 expressly declined to adopt and accordingly rejected the "death knell" theory originally announced in *Eisen, I*.

Our visiting judge, striving earnestly to accommodate his imported thinking to Second Circuit situations, would surely have been impressed by comments in Caceres v. International Air Transport Association, 422 F.2d 141 (2 Cir. 1970). This court at 143 noted that the weight of authority prior to the 1966 amendments to Rule 23 had held that an order striking class suit allegations was not appealable under Section 1291. Again, while granting that Rule 23 amendments were indeed far-reaching, the opinion said at 144, "We do not think they were intended to change that doctrine".[2]

Judge Lumbard, *supra* at p. 1311 writes:

> We have developed the "death knell" doctrine, which makes such an order "final" for purposes of appeal under 28 U.S.C. § 1291. . . .

Quite apart from the views expressed in other circuits, Judge Feinberg observes in Shayne v. Madison Square Garden Corporation, 491 F.2d 397 (2 Cir. 1974):

> Conversely, there have been rumblings of disapproval in our own court because the doctrine grants a right to appeal to some plaintiffs, but not to any defendants. E. g., *Eisen, III*, 479 F.2d 1005, 1007 n. 1 . . . and the concurring opinion of then Chief

---

1. I attach by way of Appendix Judge Blumenfeld's unreported memorandum ruling on the Herbst motion for class action designation.

2. It was suggested further that for review purposes reliance might be had on 28 U.S.C. § 1292(b).

Judge Friendly in *Korn, supra,* 443 F.2d at 1307.[3]

And what will we now say of *Eisen, III?* In 479 F.2d at 1005, 1016, it was noted that

> From the beginning it has been Judge (then Chief Judge) Lumbard's view that as a class action the case is unmanageable and that it should be dismissed as a class action.

Without our actually quoting the various "holdings" of *Eisen, III,* we need note only the Court's conclusion, *id.,* at 1020:

> For the reasons stated in this opinion the findings and conclusions following the mini-hearing are vacated and set aside, the various rulings of the District Court sustaining the prosecution of the case as a class action are reversed and, as a class action, the case is dismissed, without prejudice to the continuance of so much of the claim asserted in the complaint as refers to Eisen's alleged individual rights against the defendants.

Thus the death knell was sounded for *Eisen* unless the Supreme Court shall see something that we do not see.[4] After all these years, after the expenditure of time and effort, especially by Judge Tyler, *Eisen* is back where he started. For him the bell tolled.

Some judges are by no means clear as to the law of the Second Circuit respecting jurisdiction to review Judge Blumenfeld's interlocutory order designating the instant case as a class action. The finality contemplated in Section 1291, some might say, is no less definite than the jurisdictional prerequisites, 28 U.S.C. § 1331, where class action status is sought in a diversity action. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), insisted that the required jurisdictional amounts be made to appear despite the powerful dissent by Mr. Justice Fortas at 353, 89 S.Ct. 1053. Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), adhered to *Snyder* in affirming this court's opinion, 469 F.2d 1033 (1973).

Perhaps it is in order to take a fresh look at the problem under consideration, especially in view of the "rumblings of disapproval" as reported in *Shayne, supra.* Great temerity would be required to suggest a rehearing *en banc,* particularly after a visiting senior judge has read the views of able colleagues expressed in Zahn v. International Paper Company, *supra,* 469 F.2d at 1040 and 1041. Even so, this writer for more than thirty years[5] has viewed with

---

3. *Eisen, III,* 479 F.2d at 1020, n. 28 records Judge Friendly as having said in 1972 'that something "seems to have gone radically wrong with a well-intentioned effort". *Cf.* Judge Friendly's earlier comments, concurring, in Korn v. Franchard Corp., 443 F.2d 1301, 1307 (2 Cir. 1971). Perhaps what that great jurist *really* there meant was: If —if interlocutory orders denying class action status are to be appealable, conversely a defendant should be allowed to appeal from an interlocutory order *granting* such status.
I take it that footnote 1 in *Eisen, III, supra,* constitutes—not a holding—but a commentary on the background for the doctrine "developed" in *Eisen, I.* Perhaps footnote 1 is really an answer of sorts to the question posed by Judge Timbers, "How Did We Get Here" in International Business Machines Corporation v. United States, 480 F.2d 293, 303 (2 Cir. 1973). *Shayne,* text *supra,* interprets the "doctrine" as granting "a right to appeal to some plaintiffs, *but not to any defendants".* (Emphasis added). I assume that it is clear enough that no "death knell"

confronts any plaintiff where a class action designation has been accorded.

4. The *Eisen III* case was argued three weeks ago. Perhaps the Court will give consideration to what Judge Friendly has said in Weight Watchers of Phila. v. Weight Watchers Int. (2 Cir. 1972), 455 F.2d 770, 773–774, particularly in light of his suggestion that *Cohen* "be kept within narrow bounds, lest this exception swallow the salutary 'final judgment' rule".

5. See Western Pacific Railroad Corp. v. Western Pac. R. Co., 345 U.S. 247, 252, 73 S.Ct. 656, 97 L.Ed. 986, text and note 5 (1953), and the Court's discussion, 259–260. Of course, *en banc* orders do not always please everyone. *See, e. g.,* Williams v. Adams where this writer spoke for the court, Hays, *J.,* concurring, 436 F.2d 30 (2 Cir. 1970), reversed by *en banc* vote without further argument, 441 F.2d 394 (1971), in turn reversed, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

great favor the resolution of intra-circuit conflicting views by resort to *en banc* consideration. Although there seems to be lacking a clearly definitive ruling of Second Circuit law to govern our problem, this writer .feels constrained to submerge his own view as to the non-appealability of Judge Blumenfeld's decision. Accordingly, despite the perturbation earlier expressed, I will defer to my colleagues and join them in their disposition of the issue under consideration.

## APPENDIX

United States District Court
District of Connecticut
Civil No. 15,155
Hilda Herbst,

—vs—

International Telephone & Telegraph
Corporation,
et al.

## RULING ON MOTION FOR CLASS ACTION DESIGNATION

The gravamen of this action is the plaintiff's allegation that the defendants have violated Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b) (1970), and SEC Rule 10(b)(5), promulgated thereunder, 17 C.F.R. § 240.10b–5, in that a written exchange offer (hereinafter the Prospectus) made by the defendant International Telephone & Telegraph Corporation (hereinafter ITT) to the holders of common stock of the Hartford Fire Insurance Company (hereinafter Hartford Fire) contained misstatements and/or omissions of material fact. The parties do not dispute this court's jurisdiction to entertain this case.

Pursuant to Fed.R.Civ.P. 23(c) the plaintiff has moved for an order declaring that her action, commenced as a class action, can be so maintained. The defendants oppose this motion and alternatively contend that, if the court determines that this suit may be maintained

properly as a class action, the scope of the class claimed to be represented by this plaintiff should be substantially narrowed. The court has considered the oral arguments presented at the hearing held on January 8, 1973, as modified by the extensive briefs, memoranda, affidavits and letters which have been filed before and after the hearing, all in light of ". . . the admonition of liberality toward demands for class suit status in securities litigation (particularly 10b–5 suits) . . . ." Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972) (citations omitted). For reasons that appear below, the plaintiff's motion is granted and the defendants' motion to narrow the scope of the designated class is denied at this time. Fed. R.Civ.P. 23(c)(1).

### I.

The criteria which control the decision whether a suit may be maintained as a class action are delineated in Fed.R.Civ. P. 23(a), (b). One or more members of the alleged representative class must satisfy the four prerequisites of subparagraph (a); and, in addition, the prerequisites of either subparagraph (b)(1) or (b)(2) or (v)(3) must be satisfied. Analysis of the mass of material submitted by defense counsel indicates that they have three significant objections to the maintenance of this suit as a class action. So that the import of these arguments may be understood, it will be useful to sketch the essential contours of the plaintiff's amorphous cause of action.

### II.

The plaintiff's complaint alleges, inter alia, that as early as April 1969 ITT undertook a course of conduct intended to result in the acquisition of Hartford Fire. To facilitate that acquisition by obtaining a pre-exchange revenue ruling from the Internal Revenue Service (hereinafter IRS) that the exchange of Hartford Fire stock for stock in ITT

would not give rise to a taxable event,[1] it is alleged that ITT misrepresented its interest at the time of the exchange in some Hartford Fire stock obtained by ITT prior to the time of the exchange offer.[2] As a shareholder of Hartford Fire, the plaintiff received a Prospectus issued by ITT in 1970 which outlined the details of ITT's exchange offer to the shareholders of Hartford Fire. The substance of the information which the plaintiff claims led to the issuance of the aforementioned IRS ruling, as well as the fact of the IRS ruling, are disclosed in the Prospectus. This information constitutes the heart of the misrepresentations which, the plaintiff claims,

> ". . . induce(d) Hartford shareholders, who otherwise might not have exchanged, to tender their Hartford shares . . . (and) induced (other Hartford shareholders) to exchange on less favorable terms than they otherwise would have accepted if they had been informed of the tax risks." Plaintiff's Complaint at paragraph 17.[3]

### III.

The plaintiff, Hilda Herbst,[4] seeks to represent ". . . all persons who exchanged Hartford common stock for ITT preferred pursuant to the exchange offer." [5] The parties do not dispute that the group of persons who exchanged their Hartford Fire stock for ITT preferred presently includes persons who have subsequently disposed of the ITT stock so acquired, and others who presently retain those shares of ITT. Because the plaintiff has disposed of the shares of ITT which she received in exchange for her Hartford Fire stock, the defendants contend that she cannot adequately represent the interests of all Hartford Fire shareholders who exchanged their stock for ITT.[6] The defendants contend not only that her interests are not co-extensive with the interests of the class, but that an irreconcilable antagonism necessarily exists between the two groups of Hartford Fire shareholders described above. See 3B Moore's Federal Practice, para. 23.07 (2–3).

---

1. If the exchange of Hartford Fire stock for ITT stock was not a taxable event, the exchange would be non-taxable, as the plaintiff claims, in that no gain or loss would be recognized at the time of the exchange. Former Hartford Fire shareholders who exchanged and held their newly acquired ITT stock would, of course, be required to recognize whatever gain or loss they realized when they eventually disposed of their ITT stock.

2. The plaintiff claims that:
   "(a)n unconditional divestiture of the purchased Hartford stock to an unrelated third party was required (by IRS) in order to qualify the exchange as tax-free under the relevant provisions of the Internal Revenue Code and the rulings promulgated thereunder", (plaintiff's Memorandum of Law in Support of Motion for Class Action Determination at 3) and that ITT gave false information to IRS in order to make it appear that it had complied with the above mentioned Internal Revenue Code provisions and IRS rulings.

3. See Fed.R.Civ.P. 23(a)(2) ; Korn v. Franchard Corp., supra, 456 F.2d at 1210.

4. Although Hilda Herbst continues to be the sole named plaintiff, her counsel has in-

formed the court that additional plaintiff(s) who presently retain the ITT stock received in exchange for their Hartford Fire stock will probably be added.

5. Class members are estimated to approximate 16,000 persons. See Fed.R.Civ.P. 23(a)(1) ; Korn v. Franchard Corp., supra, 456 F.2d at 1209; Wolfson v. Solomon, 54 F.R.D. 584, 591 (S.D.N.Y.1972).

6. Although the defendants claim that this objection, and the one that follows, properly go to the typicality of the plaintiff's claim(s), see Fed.R.Civ.P. 23(a)(3) ; Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968) (hereinafter Eisen II) ; 3B Moore's Federal Practice, para. 23.06–2 at 23–325, analysis of the operational significance of these objections will be facilitated if they are considered with regard to the particularly important criterion of whether the representative plaintiff will adequately protect the interests of the class, Fed.R.Civ.P. 23(a)(4) ; compare Dolgow v. Anderson, 43 F.R.D. 472, 494 (E.D.N.Y.1968), rev'd on other grounds, 438 F.2d 825 (2d Cir. 1971), with 3B Moore's Federal Practice, para. 23.07(1) at 23–352.

In the context of this motion, the defendants' contention amounts to a difference without a distinction. Neither of the two considerations which underlie this argument indicates that this plaintiff will not adequately represent the interests of the class she seeks to represent; or that the obvious benefits which a class action will provide in the efficient and just resolution of this securities fraud suit must be foregone.

Because jural effect has been given in some instances to the difference between persons who have bought and sold stock, and persons who have not yet disposed of their stock, cf. Fed.R.Civ.P. 23.1; 3B Moore's Federal Practice, para. 23.1.17 at 23.1–151; Herman v. Steadman, 50 F.R.D. 488 (S.D.N.Y.1970), the defendants urge that difference here. But the policy considerations which justify recognition of that difference in some legal contexts do not apply with the same force where the question is the propriety of a class action designation. As several courts in this circuit have noted:

> "Practically every class action that can be brought under the Securities Acts by purchasers of securities involves claims both by those who retained their securities and those who sold them or by those who sold some securities, but still retain others. The answer to this problem is twofold. On the one hand, it is simply that every defrauded stockholder wears two hats, but that his personal interest far overshadows his interest as an equity-holder. Moreover, if, by chance, any class member currently has holdings . . . so large that he would prefer not to assert his claims for past losses, such a person, once notified of the pending action, always has the option under Fed.R.Civ. P. 23(c)(2) to request exclusion from the class." Herbst v. Able, 47 F.R.D. 11, 15 (S.D.N.Y.1969).

See also, Feder v. Harrington, 52 F.R.D. 178, 182 (S.D.N.Y.1970). Accordingly, the fact that the plaintiff no longer retains the ITT stock received in exchange for her Hartford Fire stock does not indicate that she is unable to adequately protect the interests of the entire class which she claims to represent.

Moreover, denial of class action status would not be warranted even if the damages suffered by these distinct categories of class members ultimately would have to be measured by varying criteria. In a case where it did appear that damages would depend, at least in part, on whether the shareholder(s) still retained shares, Judge Weinstein observed:

> "These two groups can be differentiated only on the basis of their damages. This distinction bears no relation to the common questions relating to liability that will be tried as part of the class action so that a narrowing of the class for this reason at this stage of the litigation is not warranted." Dolgow v. Anderson, *supra*, 43 F.R.D. at 493.

If it appears at some time in the future that the proper allocation of damages would be effectuated by the designation of appropriate subclasses, it is undisputed that the court has all the power necessary to implement such a procedure. Fed.R.Civ.P. 23(c)(4).[7] In any event, problems well down the road which may be pertinent to the procedures which ultimately should govern the allocation of damages need not and should not provide a roadblock to the prompt and conditional determination of whether this suit may be properly maintained as a class action. Fed.R.Civ.P. 23(c)(1).

The defendants also contend that the plaintiff, a taxpayer, cannot adequately represent the interests of the many

---

7. The Committee Note of the 1966 Revision of Rule 23 noted that:

"... in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." 3B Moore's Federal Practice, para. 23.01(11.–4) at 23–34.

large[8] Hartford Fire shareholders who were exempt from the federal income tax at the time of the exchange. Superficial analysis might lead to the conclusion that the tax-exempt Hartford Fire shareholders could suffer no damage from the misrepresentation of the tax consequences of exchanging their Hartford Fire stock for ITT, i. e. that as to these shareholders this "misrepresentation" was not material. From this the defendants contend that these shareholders and the plaintiff lack the requisite commonality of interest to be combined in a single class. But this analysis overlooks the subtleties of the plaintiff's complaint. If, as alleged, the effect of this misrepresentation was to induce some Hartford Fire shareholders to exchange their shares on terms less favorable than those which would have been offered if the tax consequences had been properly represented, the tax-exempt shareholders may well have been damaged as much as the non-tax-exempt shareholders since the single exchange offer was made equally to all shareholders without regard to their status quo taxpayers. The different tax status of the Hartford Fire shareholders does not bar the maintenance of this suit as a class action.

Although the court has carefully considered the defendants' other arguments concerned with the adequacy of the protection of the interests of the class which the representative party and her counsel[9] will provide, none of these considerations require that the class claimed to be represented be narrowed or that the decision that this suit may be maintained as a class action be delayed.

## IV.

The parties agree that if this suit may be maintained properly as a class action, it can be so maintained pursuant to Fed.R.Civ.P. 23(b)(3).[10] The defendants contend that questions of fact common to the members of the class do not predominate over questions affecting only individuals.[11] The heart of their

---

8. The defendants' unsupported implication that many large shareholders might choose to refrain from vindicating their legal rights would not, even if supported, affect the plaintiff's ability to maintain this suit as a class action. 3B Moore's Federal Practice, para. 23.06-2 at 23-327.

9. The defendants have not contended that there is anything "to indicate that the plaintiffs do not intend to prosecute this action vigorously or that plaintiffs' attorney is not competent to do so." Dolgow v. Anderson, *supra*, 43 F.R.D. at 494; see also, Wolfson v. Solomon, *supra*, 54 F.R.D. at 590; 3B Moore's Federal Practice, para. 23.07(1 & 4) (numerical representation and the quality of counsel).

10. Rule 23(b)(3) provides:
"Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

    \*      \*      \*      \*      \*

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

11. The defendants' contention that maintenance of this suit as a class action may not be fair or efficient overlooks the fact that Fed.R.Civ.P. 23(b)(3) requires that the fairness and/or efficiency of maintaining a suit as a class action are relative criteria to be evaluated by comparison with other available and superior methods. 3B Moore's Federal Practice, para. 23.45(3) at 23-802. Notwithstanding the defendants' terse argument to the contrary, no method or procedure has been suggested to the court which would dispose of this securities fraud case more fairly and efficiently than by a class action. See, e. g., Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed. 766 (1969); Vernon J. Rockler & Co. v. Graphic

argument is that proof of reliance by the exchanging Hartford Fire shareholders upon the material fact(s) which the defendants have allegedly misstated and/or omitted from the Prospectus is a sine qua non for recovery.[12]

Assuming arguendo that the defendants' contention retains some merit, their corollary conclusion that this suit may not proceed as a class action because questions of law or fact common to the members of the class do not predominate is nevertheless without merit.

> "Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action." Green v. Wolf Corp., *supra*, 406 F.2d at 301 (citation omitted).

The problematic relationship between reliance and materiality, causation and damage, and the mechanisms whereby reliance may be demonstrated, have been noted by courts which have faced these issues in the context of securities fraud cases. See, e. g., Korn v. Franchard Corp., *supra*, 456 F.2d at 1212; Green v. Wolf Corp., *supra*, 406 F.2d at 310. While these issues may not yet be completely settled in this circuit, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 373, 399 (2d Cir. 1973), that the presence of the issue of reliance is no bar to the designation of a class action in a case such as this is beyond dispute.

> "(W)here the activities allegedly give rise to liability are standardized, as where uniform misrepresentations are made to all members of the group, proof of individual reliance as well as individual damages may effectively be severed and treated in subsequent pro-

ceedings. . . . (S)ubstantially, it may be relatively immaterial once the form of fraud giving rise to liability is determined." 3B Moore's Federal Practice, para. 23.45(2) at 23–762–764.

See also, Affiliated Ute Citizens v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Korn v. Franchard Corp., *supra*, 456 F.2d at 1212 and nn. 15–19; Wolfson v. Solomon, *supra*, 54 F.R.D. at 591; Feder v. Harrington, *supra*, 52 F.R.D. at 183; Berland v. Mack, 48 F.R.D. 121, 128 (S. D.N.Y.1969); Herbst v. Able, *supra*, 47 F.R.D. at 16; Dolgow v. Anderson, *supra*, 43 F.R.D. at 490.

### V.

In a case such as this, Fed.R.Civ.P. 23(c)(2) requires that the court shall direct to members of the class "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1008, 1014 (2d Cir. 1973) (hereinafter *Eisen III*).

The identity of substantially all of the members of this class may be "ascertained through reasonable effort," *Eisen III, supra* at 1008, and accordingly actual individual notice must be given. The names of the members of the class may be taken from ITT's computer tapes which list the names of the Hartford Fire shareholders at the time of the exchange offer.

It does not now appear that supplementary forms of notice, or other procedures, are required to insure that actual notice will be received by the members

---

Enterprises, Inc., 52 F.R.D. 335, 346 (D. Minn.1970); Wolfson v. Solomon, *supra*, 54 F.R.D. at 592.

12. The defendants have not seriously pursued the enumerated underlying issues pertinent to this inquiry, Fed.R.Civ.P. 23(b)(3)(A–D). Of these, only Fed.R.Civ.P. 23(b)(3)(D) (management difficulties) would appear

to present a colorable issue and the court's rejection of the defendants' analysis of the significance of reliance (for purposes of this motion) negates any claim that the maintenance of this suit as a class action would present unusual management difficulties. Korn v. Franchard Corp., *supra*, 456 F.2d at 1214.

of the class. But see, *e. g.*, Berland v. Mack, *supra*, 48 F.R.D. at 130; Herbst v. Able, *supra*, 47 F.R.D. at 21.

Resolution of which party[13] should bear the cost of providing notice necessarily begins with the observation in *Eisen II, supra,* 391 F.2d at 568, that "(t)he task of furnishing notice to the class members in such a case as this must rest upon the representative party when he is the plaintiff."[14] (Footnote omitted). In the most recent round of the *Eisen* litigation, *Eisen III, supra,* 479 F.2d at 1009 n. 5, the court focused directly on this issue and more fully delineated the considerations which control a district court's discretion under Fed. R.Civ.P. 23(c)(2) in allocating the cost of providing the requisite notice between the parties. Although that decision indicates that there may be circumstances which might excuse the plaintiff from paying all or part of the expense entailed in giving the notice required by Fed.R.Civ.P. 23,[15] *Eisen III, supra,* 479 F.2d at 1009 n. 5, such circumstances are not presented by this action.[16]

Assuming arguendo that the relative economic burden of the provision of notice is a relevant factor which this court properly may consider in the exercise of its discretion, *Eisen III, id.,* the expense of providing the notice ordered herein, estimated by the plaintiff at approximately $2240, does not appear to be so burdensome as to warrant excusing the plaintiff from paying it. See Korn v. Franchard Corp., 50 F.R.D. 57, 60 (S.D. N.Y.1970). This is not a petty sum; and the plaintiff claims to be "not a wealthy woman." However, there is no allegation, nor reason to believe, that requiring this plaintiff, in conjunction with any plaintiffs subsequently named as representative parties, see footnote 4, *supra*, to bear this preliminary cost of litigation intended ultimately to benefit them will sound the death knell of this action. See Berland v. Mack, *supra*, 48 F.R.D. at 131.[17]

In addition to bearing the cost of printing, stuffing, and mailing the notice to the class, the plaintiff shall bear the administrative burden of mailing the

---

13. The plaintiff's suggestion that the cost of notice be borne by the court is not a viable alternative. See Administrative Office United States Courts Memorandum No. 562, Supplement No. 2 (March 26, 1973); *Eisen II, supra,* 391 F.2d at 568 n. 23; 3B Moore's Federal Practice, para. 23.55 at 23–1155 n. 21.

14. The full import of that decision has not been free from doubt. See, e. g., Green v. Wolf Corp., *supra*, 406 F.2d at 301 n. 15; Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253, 269 (S.D.N.Y.1971), rev'd, *Eisen III, supra,* 479 F.2d 1005; Feder v. Harrington, *supra*, 52 F.R.D. at 184; Berland v. Mack, *supra*, 48 F.R.D. at 131, *noted, Eisen III, supra,* 479 F.2d at 1009 n. 5; 3B Moore's Federal Practice, para. 23.55 at 23–1155 nn. 20 and 21.

15. It is not disputed that a successful plaintiff may recover as part of his costs the money expended in providing the requisite notice at the outset of his litigation.

16. This is not a shareholders' derivative suit where the fiduciary duty owed shareholders by the corporation may justify exempting the plaintiff from this burden. Similarly, since a significant percentage of the mem-

bers of the class are no longer shareholders of ITT, they cannot claim a continuing fiduciary relationship with ITT, nor that the corporation will be sending them written communications in the regular course of business.

17. The mere fact that a plaintiff cannot bear the cost of notice does not indicate that the defendant must pick up this bill. The desire to implement the class action device effectively must always be balanced by the fear that excessive concern for the financial interests of the plaintiff may result in the imposition of unwarranted expenses upon the defendant. Berland v. Mack, *supra*, 48 F.R. D. at 131. This is especially true where, as in this case, the plaintiff has refused to accept the court's invitation to post a bond equal to the cost of providing notice. *Eisen III, supra,* 479 F.2d at 1008. Assuming arguendo that analysis of the relevant criteria indicated the propriety of transferring this cost of litigation initially to the defendant, were the defendant to prevail on the merits, such a bond would have protected it against the possible futility of trying to collect costs from a plaintiff unable to pay. See *Eisen III, supra,* 479 F.2d at 1020 (Hays, *J.,* concurring in the result).

notices. However, to facilitate and expedite the plaintiff's task, see Wolfson v. Solomon, *supra,* 54 F.R.D. at 593; 3B Moore's Federal Practice, para. 23.55 at 23–1159 n. 35, the defendants will provide her with the requisite materials in their possession.

Accordingly, the court finds that the prerequisites to maintenance of a class action as delineated in Fed.R.Civ.P. 23(a) and (b)(3) exist, and

It is hereby ordered that:

1. The plaintiff's motion for a determination that her action may be maintained as a class action is granted.

2. Pursuant to Fed.R.Civ.P. 23(c)(1), this order is subject to future modification by this court and may be altered or amended prior to decision on the merits.

3. The class represented by the plaintiff shall include all Hartford Insurance Company (Hartford Fire) shareholders who exchanged their Hartford Fire common stock for Series N convertible preferred stock of International Telephone & Telegraph Corporation (ITT) pursuant to an exchange offer made by ITT on or about May 26, 1970; provided, however, that the above described class shall not include any such persons who indicate in response to notice hereinafter provided for that they do not wish to be so included.

4. The parties are directed to submit to the court within ten (10) days following the date of entry of this order a form of notice to be mailed to class members. If such form of notice is agreed to by all parties, the plaintiff shall send a copy of such notice to each class member by first-class mail within thirty (30) days following the submission of such notice to the court. If such form of notice is not agreed to by all parties, the plaintiff shall send a copy of the notice thereafter authorized by the court to each class member by first-class mail within thirty (30) days following such authorization.

5. Defendants shall provide the plaintiff with listings or materials in their possession useful for the notification of class members not later than ten (10) days before the date upon which the plaintiff is required to send notice under this order.

6. The parties shall obtain a post office box at the United States Post Office within the City of New York for the handling of class correspondence. The box shall remain under the joint control of the parties, or a person selected by them, and all such requests and other materials shall be available for inspection by all parties.

7. The costs of providing notice to the class as herein provided shall be borne initially by plaintiff, provided, however, that should judgment be entered in favor of the plaintiff, the reasonable costs incurred in providing such notice shall be taxed as a cost of this lawsuit.

8. Pending notification of the class, neither plaintiff nor her counsel, nor defendants nor their counsel, shall solicit or otherwise independently contact any member of the class in the absence of court approval.

Dated at Hartford, Connecticut, this 11th day of May, 1973.

/s/ M. Joseph Blumenfeld
M. Joseph Blumenfeld
Chief Judge

MULLIGAN, Circuit Judge (concurring):

I fully agree with Judge Lumbard that the district court correctly determined that a class action here was proper. Although I have grave doubt that this order granting class action status is appealable, I am not inclined to depart from *Eisen III* which is now on review in the Supreme Court.